## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

### UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Name (under which you were convicted):<br>**AARON SALTER** | Docket or Case No.:<br>15 - 1298<br>SECT...MAG.3 |
| Place of Confinement:<br>Louisiana State Penitentiary | Prisoner No.<br># 101124 |
| Name of Petitioner<br>**AARON SALTER** | Name of Respondent (custodian):<br>V.      **N. BURL CAIN** |

The Attorney General of the State of Louisiana: **JAMES D. CALDWELL**

### PETITION

1.  (a)  Name and location of court which entered the judgment of conviction under attack: 22nd. Judicial District Court, St. Tammany Parish

    (b)  Criminal docket or case number (if you know): _____ 482 - 750

2.  (a)  Date of judgment of conviction: _____ July 15, 2011

    (b)  Date of sentencing: _____ October 10, 2011

3.  Length of sentence: _____ Life

4.  In this case, were you convicted on more than one count or of more than one crime?

    [ ]  Yes   [x]  No

5.  Identify all crimes of which you were convicted and sentenced in this case: _____
    R. S. 14:60  AGG. BURGLARY

6.  (a)  What was your plea?   [ X ]  (1)  Not guilty   [ ]  (3)  Nolo contendere (no contest)
                              [ ]  (2)  Guilty        [ ]  (4)  Insanity plea

    (b)  If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?
    _____

    (c)  If you went to trial, what kind of trial did you have? (Check one)
    [X]  Jury              [ ]  Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?  Yes  [ ]  No  [ ]

8.  Did you appeal from the judgment of conviction?      Yes   [ X ]   No   [ ]

TENDERED FOR FILING

APR 2 1 2015

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

9.   If you did appeal, answer the following:

   (a)   Name of court: LOUISIANA FIRST CIRCUIT COURT OF APPEAL

   (b)   Docket or case number (if you know): _____

   (c)   Result: _____ DENIED _____

   (d)   Date of result (if you know): _____ SEPTEMBER 21, 2012 _____

   (e)   Citation to the case (if you know): _____

   (f)   Grounds raised: _____ SEE ATTACHED MEMORANDUM _____

                   _____

                   _____

                   _____

   (g)   Did you seek further review by a higher state court?  Yes  [ X ]  No   [ ]

        If yes, answer the following:

        (1)   Name of court: __ LOUISIANA STATE SUPREME COURT _____

        (2)   Docket or case number (if you know): _____

        (3)   Result: _____ DENIED _____

        (4)   Date of result (if you know): ____ MAY 3, 2013 _____

        (5)   Citation to the case (if you know): _____

        (6)   Grounds raised: _____ SEE ATTACHED MEMORANDUM ____

           _____

   (h)   Did you file a petition for certiorari in the United States Supreme Court?

      Yes  [ ]  No   [X]

      If yes, answer the following:

        (1)   Name of court _____

        (2)   Docket or case number (if you know): _____

        (3)   Result: _____

        (4)   Date of result (if you know): _____

        (5)   Citation to the case (if you know): _____

10.  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

      Yes    [ X ]    No    [ ]

11.  If your answer to Question 10 was "Yes," give the following information:

   (a)   (1)   Name of court _____ 22nd Jud. Dist Ct. _____

        (2)   Docket or case number (if you know): _482-750 _____

        (3)   Date of filing (if you know): __SEPTMEBER 9, 2013 _____

(4)   Nature of the proceeding: _____ APPLICATION FOR POST CONVICTION RELIEF

(5)   Grounds raised: _____ SEE ATTACHED MEMORANDUM _____

_____

(6)   Did you receive an evidentiary hearing on your petition, application or motion?

      Yes   [ ]   No   [X]

(7)   Result: _____ DENIED _____

(8)   Date of result (if you know): _____ SEPTEMBER 23, 2013 _____

(b)   If you filed any second petition, application or motion, give the same information:

(1)   Name of court: _____

(2)   Docket or case number (if you know): _____

(3)   Date of filing (if you know): _____

(4)   Nature of the proceeding: _____

(5)   Grounds raised: _____

_____

(6)   Did you receive a hearing where evidence was given on your petition, application, or motion?   Yes   [ ]   No   [ ]

(7)   Result: _____

(8)   Date of result (if you know): _____

(c)   If you filed any third petition, application, or motion, give the same information:

(1)   Name of court: _____

(2)   Docket or case number (if you know): _____

(3)   Date of filing (if you know): _____

(4)   Nature of the proceeding: _____

(5)   Grounds raised: _____

_____

(6)   Did you receive a hearing where evidence was given on your petition, application or motion?   Yes   [ ]   No   [ ]

(7)   Result: _____

(8)   Date of result: _____

(d)   Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

      (1)   First petition, etc.   Yes   [X]   No   [ ]

      (2)   Second petition, etc.   Yes   [ ]   No   [ ]

      (3)   Third petition, etc.   Yes   [ ]   No   [ ]

(e)   If you did not appeal to the highest state court having jurisdiction, explain why you did not: _____

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

  CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE:

    (a)    Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim): *See Memorandum of Law attached hereto*

    (b)    If you did not exhaust your state remedies on Ground One, explain why: _____

    (c)    **Direct Appeal of Ground One:**

        (1) If you appealed from the judgment of conviction, did you raise this issue:

            [X]    Yes    [ ]    No

        (2) If you did not raise this issue in your direct appeal, explain why: _____

    (d)    **Post-Conviction Proceedings:**

        (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?    [X ]Yes    [ ]    No

        (2) If your answer to Question (d)(1) is "Yes," state:

            Type of motion or petition: _____APPLICATION FOR POST CONVICTION RELIEF

            Name and location of the court where the motion or petition was filed: _____

            22nd, Jud. Dist. Ct.

            Docket or case number (if you know): _____

            Date of the court's decision: ___SEPTEMBER 21, 2012_____

            Result (attach a copy of the court's opinion or order, if available).

        (3) Did you receive a hearing on your motion or petition? [ ]    Yes    [X]    No

        (4)  Did you appeal from the denial of your motion or petition? [X]  Yes    No    [ ]

        (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

            [ ]    Yes    No    [ ]

1. If your answer to Question (d)(4) is "Yes," state:

        Name and location of the court where the appeal was filed: ____La. 1st Cir. Ct. of Appeal

                      P.O. BOX 448, BATON ROUGE, LA. 70821_____

        Docket or case number (if you know): _____

Date of the court's decision: _____ FEB. 27, 2014

Result (attach a copy of the court's opinion or order, if available).

(7) If your answer to Question (d)(4) or Question (d)(4) is "No," explain why you did not raise this issue: _____

(e)     Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

_____

13.   Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? [X] Yes   No   [ ]

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

(b)     Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not been presented, and state your reasons for not presenting them: _____

14.   Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?   [ ] Yes   No   [X]

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available.

15.   Do you have any petition or appeal now pending (filed and not decided yet) in any court,         either state   or federal, for the judgment you are challenging?         [ ] Yes   No   [X]

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding,       the issues raised.

16.   Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _____

(b) At arraignment and plea: _____

(c) At trial: _____ MR. PATRICK JOSEPH       ESQ. _____

(d) At sentencing: _____ SAME AS ABOVE _____

(e) On appeal: _____ MR. FRANK SLOAN  ESQ _____

(f) In any post-conviction proceeding: _____ NONE _____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        [ ] Yes   No   [X]

(a) If so, give name and location of court that imposed the other sentence you will serve in the future.

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?        [ ] Yes   No   { }

18.  **TIMELINESS OF PETITION:** If your judgment of conviction became final over one year   ago, you must explain the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.   **SEE ATTACHED MEMORANDUM   TIMELY FILED**

THEREFORE, petitioner asks that the Court grant the following relief: Reverse his conviction and sentence or any other relief to which petitioner may be entitled.

Respectfully submitted by:

_Aaron Salter_

_____ # _____

Aaron Salter # 101124
Camp D, Eagle - 1
Louisiana State Prison
Angola, Louisiana 70712

I declare (certify, verify, or state) under penalty of perjury that the foregoing is true and correct and correct and that this Petition for Writ of Habeas Corpus was placed in the mailing system. Executed (signed) on the day of _APR. 20_, 20 _15_

_Aaron Salter_

Aaron Salter # 101124
Camp D, Eagle Unit - 1
La. State Penitentiary
Angola, LA. 70712

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

# IN THE

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

No. _____

### AARON SALTER
Petitioner

Versus

### BURL CAIN, Warden
Louisiana State Penitentiary
Respondent

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW IN SUPPORT
## OF PETITION FOR HABEAS CORPUS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Respectfully Submitted By,

Aaron Salter # 101124
Camp D, Eagle - 1
Louisiana State Penitentiary
Angola, Louisiana 70712

## PETITIONER PRO SE

## Table of Contents

MEMORANDUM IN SUPPORT............................................................................1
JURISDICTION..............................................................................................1
STATEMENT OF THE CASE............................................................................2
TIMELY FILED & CLAIMS PROPERLY EXHAUSTED.........................................5
STANDARD OF REVIEW...............................................................................12
QUESTIONS PRESENTED.............................................................................12
ISSUES PRESENTED....................................................................................13
ISSUE NUMBER ONE...................................................................................15
ISSUE NUMBER TWO...................................................................................18
ISSUE NUMBER THREE................................................................................21
CERTIFICATE OF SERVICE..........................................................................39

## Table of Authorities

### FEDERAL CASES:

Berger v. United States, 295 U.S., at 88, 55 S.Ct. At 633..................................26
Blackledge v. Perry, 417 U.S., at 27, 94 S.Ct., at 2101....................................36
Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963)............22
Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)...........22, 23
Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)..........22
Henderson v. Cockrell, 333 F.3d 592 (5th Cir. 2003).......................................12
Jackson v. Virginia, 443 U.S. 37, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)............17
McKane v. Durston, 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894)...............22
Miller v. Johnson, 200 F.3d 274 (5th Cir.), cert. Denied, 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77
(2000).......................................................................................................12
North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656............36
Smith v. Phillip, 102 S.Ct. 940, 455 U.S. 209 (1982).......................................34
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)........22
U.S. v. Williams, 112 S.Ct. 1735, 504 U.S. 36 (1992)......................................26

### UNITED STATES CONSTITUTIONS:

Sixth Amendment...............................................................21, 22p., 23, 26
Fourteenth Amendment.......................................................18, 21, 22p., 26, 36

### UNITED STATES STATUTE LAWS:

28 U.S.C. §2241.............................................................................................1
28 U.S.C. §2254.............................................................................................1

### LOUISIANA CASES:

State v. Captville, 448 So.2d 676 (La. 1984)...................................................17
State v. Fuller, 454 So.2d 119 (La. 1984).......................................................22
State v. Henderson, 362 So.2d 1358 (La. 1978)................................................34
State v. Neal, 2000-0674 p. 9 (La. 6/29/01), 796 So.2d 649, cert., denied, 535 U.S. 940, 122 S.Ct. 1323,

152 L.Ed.2d 231 (2002)..................................................................................17

## LOUISIANA CONSTITUTIONS:

La. Const. Art. 13.................................................................................18, 21
La. Const. Art. 2...................................................................................18, 21

## LOUISIANA STATUTORY LAWS:

L.C.E. Art. 802....................................................................................19
L.C.E. Art. 803(2)................................................................................19p.
La. R.S. 14:60......................................................................................15
La. R.S. 15:438.....................................................................................17
La. R.S. 15:529.1(d)..............................................................................38
La.C.Cr.P. Art. 61.................................................................................38
La.C.Cr.P. Art. 61).................................................................................38
La.C.Cr.P. Art. 701................................................................................37

IN THE

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

AARON D. SALTER                                    CIVIL ACTION NO._____

VERSUS                                             SECTION:_____

N. BURL CAIN, WARDEN
Louisiana State Prison                             _____
                                                                    JUDGE

## MEMORANDUM IN SUPPORT

MAY IT PLEASE THE COURT:

    COMES NOW, **Aaron Salter**, filing his Petition for Writ of Habeas Corpus and Memorandum of Law in Support, in support hereof Salter will show the Court the following:

## JURISDICTION

    The Federal Writ of Habeas Corpus is authorized by *28 U.S.C. §2241*. A person in custody in a State prison may seek relief by the court for Writ of Habeas Corpus pursuant to *28 U.S.C. §2254*. Salter is a State prisoner being detained in custody of Burl Cain, Warden, of the Louisiana State Penitentiary at Angola, Louisiana. Respondent Cain, has custody of Salter by virtue of a St. Tammany Parish conviction and sentence imposed by the 22nd Judicial District Court, of Louisiana. Salter now claims that Respondent is illegally restraining his liberty because the conviction and sentence were illegally imposed upon him by the State of Louisiana. Therefore, Salter seeks release from Respondent's custody by this Petition for Writ of Habeas Corpus.

## STATEMENT OF THE CASE

    Between August 23, 2006 and August 26, 2007, the State of Louisiana alleges that Aaron D. Salter held Joyce Bennett against her will for three consecutive days. That he forced his way into Lori Lee Turner's trailer on the morning of August 26, 2007 and forcible removed Bennett from within the structure in an attempt to continue his efforts to hold her against her will.

    On November 11, 2007, Salter was arrested and booked in New Iberia as a fugitive from Slidell, Louisiana by virtue of an outstanding warrant for aggravated rape and second degree kidnapping. On November 20, 2007, Salter was transported from New Iberia to Slidell to face said accusations. On February 26, 2008, the grand jury returned a true bill indicting Salter with one count of aggravated rape

only.  On August 19, 2009, Salter filed a motion for speed trial in accordance with La.C.Cr.P. Art. 701.
By January 19, 2010, the State of Louisiana had not advanced Salter's matter to trial.  Consequently,
Mr. Salter's motion for a speedy trial was granted, and the Court ordered his release on his own
recognizance.  However, the St. Tammany Parish District Attorney's Office circumvented Salter's right
to an immediate release from custody by filing a bill of information against him for aggravated
burglary, which was based upon the very same nucleus of facts that the grand jury indicted him on for
aggravated rape.  Salter's defense counsel request and was granted to withdraw as counsel of record.

On July 14, 2010, newly retained counsel for Salter filed, among other motions, a motion for a
preliminary hearing and a motion in limine.  The motion in limine was filed to prohibit the State from
attempting to introduce the following forms of evidence at trial:

1.  any and all oral testimony or physical evidence regarding the events leading up
    to and surrounding an alleged aggravated rape and/or kidnapping the occurred on
    or about Thursday, August 23, 2007 through Saturday, August 25, 2007 at
    midnight recorded under Slidell Police Department's incident number
    0708-2911;

2.  the fact that the accused has been implicated in connection with a separate
    offense of aggravated rape and/or any of the facts and circumstances surrounding
    that aggravated rape including the notion of any sexual assault;

3.  any other crimes, wrongs, or acts tending to show "bad character" of the accused
    in order to show or infer that he acted in conformity therewith;

4.  any inculpatory/incriminating statement that has not been previously deemed
    admissible at trial by this court; and

5.  any reference to the nickname "Dirty Red", "Red", and/or "OG" by any of the
    attorneys or investigators associated with this case and/or by any and all law-
    enforcement witnesses, lay witness, and/or expert witnesses.

6.

On April 1, 2011, the trial court denied the motion in limine in its entirety.  The court deferred
the preliminary examination until April 21, 2011.  At the preliminary hearing, the State called district
attorney investigator Denise Blair, instead of Detective Charles Tabor, to testify about the new trumped
up charge of aggravated burglary with which Blair conceded she had absolutely no involvement with
this case until the day before the preliminary examination.  Her only involvement was listening to an
unauthenticated audio tape of a conversation between Detective Tabor and Laura Lee Turner.  Blair was
unable to testify that Turner positively identified Salter as the perpetrator simply because she knew
nothing about the case.(transcript pg. 8, lines 17-22).

In fact, Blair testified that she was uncertain as to the authenticity of the audio tape and that she

did not recognize Laura Lee Turner's voice on the tape because she **does not** know her and she **never** interviewed her about this incident. (transcript pg. 8, lines 24-32 & pg. 9, lines 1-3). Additionally, she testified that she **never** interviewed lead Detective Tabor in connection with this case. (transcript pg. 9, lines 4-12). To add insult to injury, Blaire further testified that she have **never** visited the structure where the alleged aggravated burglary occurred, she **never** observed any type of damage to the trailer, she **never** observed any pry marks to the front door, she is a former law-enforcement officer but it is **not** her job to request that the trailer be processed for evidence of an aggravated burglary, she **did not** review the entire investigation prior to testifying in support of probable cause she **did not** speak to any "live person" involved in the investigation of Salter for aggravated burglary, she **never** became aware of the existence of any physical evidence seized in connection with an aggravated burglary at 41931 Highway 190, she did **nothing** to corroborate the statement of the voice she heard on the audio tape, and she **never** spoke with the female that the voice on the audio tape alleges was held against her will. (transcript pg. 11, lines 19-26, pg. 12, lines 1-3, pg. 12, lines 4-6, pg. 12, lines 7-15, pg. 12, lines 30-32, pg. 13, lines 12-17, pg. 13, lines 18-21, pg. 15, lines 18-23, and pg. 16, lines 31-32).

Favorable to the defense, however, was Blair's testimony for when she stated, after listening to the tape, if the accused went into the FEMA trailer it was briefly because she **did not** hear the voice on the tape telling Salter directly to get out of her trailer and not come back. (transcript pg. 18, lines 26-32 & pg. 19, lines 1-5). The most egregious aspect of Blair's testimony, aside from her participation as an incompetent witness, was the fact that she **never** made a positive in-court identification of Salter as the person that Laura Lee Turner was referring to on the audio tape.

Apparently, the State was hard-press to build a case against Salter and took a chance. Fortunately for the State, the trial court found probable cause to set the matter for trial, which was inconceivable because the trial relied on Blair's testimony to find probable cause. This set the stage for the State to prosecute Aaron Salter (a black male) on the theory that he raped and kidnapped a white woman for three days. The problem is, Salter was on trial for aggravated burglary. A crime that he was never officially arrested for or booked on, which would have been the normal process. Only one of the State's witnesses, Turner, contributed her testimony on an allege aggravated burglary. The six (6) remaining witnesses knew nothing about a burglary, nor were they questioned about this burglary.

On July 15, 2011, Mr. Salter was found guilty as charged by the trial jury. On September 7, 2011, he was arraigned on the amended Multiple Offender Bill of of Information. On October 10, 2011, Mr. Salter trial on the Multiple Offender Bill of Information and found to be a fourth felony offender and sentenced to was sentenced to life imprisonment imprisonment at hard labor without benefit of probation or suspension of sentence.

## TIMELY FILED & CLAIMS PROPERLY EXHAUSTED AS REQUIRED BY AEDPA

On October 10, 2011, trial counsel filed a motion for an appeal.   On February 14, 2012, appellate counsel, Frank Sloan filed his appellate brief. On April 9, 2012, the State filed its opposition brief.  On April 19, 2012, appellate counsel filed a reply brief.

### Claims on Direct Appeal:

On September 21, 2012, the Louisiana First Circuit Court of Appeal denied Mr. Salter relief on the merits.  On October 5, 2012, appellate counsel moved the court for a rehearing.  On October 25, 2012, the court denied rehearing.   Thereafter, appellate counsel filed writ of certiorari into the Louisiana State Supreme Court. On May 3, 2013, the Louisiana Supreme Court denied writ of certiorari.

### Claims on Collateral Review:

On September 9, 2013,  Mr. Salter filed a post conviction relief petition into the trial court.

On September 23, 2013, the trial court denied relief. On October 14, 2013, Mr. Salter sought review into the Louisiana First Circuit Court of Appeal.  On February 27, 2014, the circuit court adopted the trial court's opinion and denied review.  On March 24, 2014, Mr. Salter sought writ of certiorari into the Louisiana Supreme Court.  On December 8, 2014, the Louisiana Supreme Court denied writ or certiorari. **(See attached briefs and rulings by the lower courts).**        Therefore, Mr. Salter is timely before this Honorable Court.

At trial, the following testimonies occurred:

### LORI LEE TURNER

Turner testified, that it was a Sunday Salter knocked on her Trailer door asking her did she wanted to smoke crack cocaine. Turner was with a white female name Bennett [*Why would Salter ask her this if he did not have any money*]. Salter allegedly told Lee that he did not have money for a hotel and wanted to sleep at her Trailer. In turn, Lee told him no, that he will have to sleep in his car. According to Lee, the white female came back to the trailer and knock on the door asking to use the restroom. She let her in. While in the trailer Turner testified she observed bruises on the female. The white female started crying and shaking, telling Turner that she was kidnapped by Salter and that he beat her and made her trick for three (3) days. Lee testified that Salter came to the trailer and started knocking on the door asking for the white female. Turner stated she did not let him in. Salter then beat and yanked until the trailer door came open. Salter entered the trailer and, according to Turner, she hit him in the head with a hammer. Somehow Salter recovered from this allege blow to the head, grabbed the female by the hair and pulled her out the trailer. Turner started screaming for help.  Three

neighbors came to her rescue and commenced beating on Salter – forcing him to release the white female. Lee then observed Salter get into his car and left.. (See Doc.No.pgs. 379-386).

Under cross-examination Turner described the white female bruises as Blue and Purple. That she observed bruises on the white female back as well as her arm. Strangely, Lee testified did not called the police about the incident. Someone else called the St. Tammany Parish Sheriff Department and the Ambulance. (See Doc.pgs. 388-416).

## ROBERT CRAIN:

Crain testified that he was walking from his porch to the yard when he heard hollering. He looked in that direction and observed a black guy banging and smacking a white girl head with his fist. He thought the black guy was about to kill the girl and he went over there and literately beat the guy all the way to the guy's car. The black guy got into his car and took off. He never seen him or the white girl again. (See Doc.pgs. 423-425).

Under cross-examination, Crain testified it was board daylight when this incident occurred because he just got off from work. From inside his trailer he did not hear the commotion, but when he ventured outside en route to his yard, he heard it. Contrary to Lee's testimony, he never observed the perpetrator grabbing the female hair or dragging her to a car. However, he did observed this allege perpetrator banging the white female head against a trailer and hitting her in the head. (See Doc.pgs. 426-430).

On redirect, Crain testified he could not identify Aaron Salter as the perpetrator because the person kept his head down. (See Doc.pgs. 431-432).

## DETECTIVE JARED LUNSFORD:

Det. Lunsford's testimony consisted primary of the allege rape of Joyce Bennett. He knew nothing about an aggravated burglary. Det. Lunsford testified it was never reported. He had never arrested or booked Salter for aggravated burglary. Through excited utterance, the trial court allowed Det. Lunsford to testify to what Bennett, the white female, allegedly told him how she was raped. Through the entirety of Det. Lunsford's testimony, the State described Bennett as the *"white female."* The State elicited from Det. Lunsford, that the white female appeared distraught, as though she was emotionally shaken. That she was scared and did not appear to know what was going on. That she was abducted and raped for the pass several days at the Slidell Motel 6. The State also elicited from Det. Lunsford the conversation he allegedly had with Turner. (See Rec.pgs. 438-440).

According to Det. Lunsford, Turner told him she defended a white female after the female came to her and told her she had been raped and held against her will. That the person forced his way into the trailer and she hit him with a hammer. Det. Lunsford was asked by the State did he have an

opportunity to observe the structure (trailer) and the detective responded that he did. The detective merely described steps leading up to the main entrance of the trailer, and that "the door frame was damaged." (See Doc.pg. 446).

The State went on to described Bennett as the victim, as though Salter was on trial for her alleged rape. (See Doc.pg. 448).

Under cross-examination by defense counsel, Det. Lunsford testified there was never a police report written for aggravated burglary, and that he had never went inside of Turner's trailer. (See Doc.pg. 450). Defense counsel asked Det. Lunsford, "did you ever once consider going back to that victim, locating that victim, and reinterviewing her and completing a supplemental investigation?" Det. Lunsford responded "No, sir." (See Doc.pg. 451). Again defense counsel asked, "At any time, from the date of the incident, August 26, 207, did you ever go back in those four years and reinterview any of those people?" Det. Lunsford respond, "[f]our years, I made a mistake. I did not go back ever and do that. That is correct." (See Doc.pg. 452). Det. Lunsford, went on to testified that he did manage to see damage to the trailer like a doorjamb. That the metal door jammed was bent and damaged. (See Doc.pg. 453). Yet, Salter was never accused of breaking into Lee's trailer.

## DETECTIVE CHARLES TABOR:

Detective Tabor took statements from both Turner and Crain, the tree-man, and obtained the arrest warrant for Salter arrest for rape and kidnap. He encountered the allege rape victim, Joyce Bennett, in the Medical Center emergency room and described her as withdrawn and reluctant to speak. According to Det. Tabor, he developed a rapport with her after awhile. (See Doc.pg. 463).

As a result of defense counsel objecting to the State's attempt to elicit information on what Bennett told him, Bennett's alleged rape ordeal did not come out. But the State did managed to leak information to the jury when Det. Tabor testified that Bennett was examined in the emergency room; and that he went to the locations of the allege rapes and that she was raped. (See Doc.pg. 467-468). He also testified that he pursued an arrest warrant for Salter for rape and kidnapping and that Salter was actually arrested for rape and kidnapping. (See Doc.pgs. 475-476).

Under cross-examination, defense counsel elicited from Det. Tabor that the reason the police confiscated Salter's car was for the purpose of recovering evidence on the rape and kidnapping, not for aggravated burglary. The alleged aggravated burglary, as written in the police report, occurred around 9:00 in the morning. Det. Tabor testified that he never got a call concerning an aggravated burglary on Turner's trailer. He could not corroborate Turner's statement because she was the only person there. He could not find any information at Motel 6 to confirm the white female story. (See Doc.pgs. 480-491).

As for whether Det. Tabor observed any bruises on Bennett, Det. Tabor testified he observed some fresh scratches on her arms, and bruise marks on her neck that was red and irritated. He conceded to never contacting the crime lab to take photographs of Bennett's injuries. (See Doc.pgs. 492-495). Det. Tabor also described what he confiscated from Salter's car, i.e., "Ladies shoes, flip flops, a bra, shirt, panties, toiletries, sunglasses, hair clips, and miscellaneous personal belongings." (See Doc.pg. 498). Also disturbing, however, is that Det. Tabor never interviewed Salter concerning the allege rape or aggravated burglary. (See Doc.pg. 506).

Under redirect the State asked Det. Tabor questions primarily about the alleged rape incident. (See Doc.pgs. 507-515).

Under recross-examination by defense counsel, Det. Tabor for the first time revealed the existence of a rape kit. (See Doc.pg. 515).

OFFICER TROY FRANKLIN:

Officer Franklin was the transporting officer who transported Salter from New Iberia Parish to Slidell. He testified that Salter was very talkative in the vehicle and that Salter disclosed he took Joyce Bennett from someone else and said he took care of her. The State interjected that Salter was a pimp and that he was going to kill Bennett if she complained -- defense counsel objected. (See Doc.pgs. 523-526).

Under cross-examination by defense counsel, Officer Franklin conceded that he never wrote a statement concerning this alleged incident. (See Doc.pg. 533).

The State rested their case and the defense introduced the following witnesses:

DOCTOR ANDREW MARSH:

Dr. Marsh testified that he was the initial doctor who interviewed and examined Joyce Bennett when she arrived at the emergency room. According to Dr. Marsh, Bennett told him that she was strangled and had neck pains. Dr. Marsh notice a minor abrasion on the left side of her neck, other than that, he did not see bruises or trauma to the face or head. Nor did he see any bruises to the left arm or back. Dr. Marsh looked for any and all signs of strangulation and did not see any. In fact, he found no reason to conduct a CAT scan. Bennett was tested positive for THC. (See Doc.pgs. 542-544).

In support of Dr. Marsh medical examination, the Nurse's Notes state, there was no indication or visible signs of trauma to Bennett's head, cerebral, chest, back or extremities. Her clothes was clean and intact. A rape examination was conducted, but the kit was never given to the defense. Dr. Marsh testified he did not see any sexual violent activity, tears or lacerations. The defense had no knowledge of a rape kit. (See Doc.pgs. 546-549).

ANITISHA ANTHONY:

Anthony testified that she was the front desk clerk for Deluxe Motel in Slidell, the Motel that Det. Tabor reiterated Joyce Bennett told him she was raped at. On August 24, 2007, Anthony testified she checked Salter into the Motel and observed a female with him that was not black sitting in his car while he (Salter) was inside checking in. According to Anthony, twenty minutes later the female came to the front and asked for extra towels. She said Salter was not with her. Later that night she seen Salter in a Club with another guy. Again, the female was not with him. She recall Salter being at the Club for a long time. The next day, while at work, Anthony testified she went to the room where Salter and the female checked in to see whether they vacated the room so it can be clean. She knocked and the female came to the door. Anthony asked the female was they going to stay overtime and the female said she was waiting on Salter to return. (See Doc.pgs. 560-573). The defense thereafter rested their case.

## II. STANDARD OF REVIEW:

The AEDPA proscribes "[a]n application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Miller v. Johnson, 200 F.3d 274, 281 (5th Cir.), cert. Denied, 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000).

"Review is de novo when there has been no clear adjudication on the merits." Miller v. Johnson, 200 F.3d at 281 n.4 (5th Cir. 2000). See Henderson v. Cockrell, 333 F.3d 592 (5th Cir. 2003) (With respect to claims that were not adjudicated on the merits in state court, the deferential AEDPA's standards of review do not apply," and such claims are reviewed "under pre-AEDPA standards of review").

## QUESTIONS PRESENTED

I.    WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT.

II.    WHETHER THE TRIAL COURT ERRED AND/OR ABUSED HIS DISCRETION IN SEVERAL EVIDENTIARY RULINGS THAT WERE PREJUDICIAL TO MR. SALTER IN VIOLATION OF 14TH AMENDMENT RIGHT TO THE UNITED STATES CONSTITUTION AND ARTICLES 2 AND 13 OF THE 1974 LOUISIANA CONSTITUTION.

III.    WHETHER THE APPELLATE COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE 6TH AND 14TH AMENDMENT RIGHT TO THE UNITED STATES CONSTITUTION AND ARTICLES 2 AND 13 OF THE 1974 LOUISIANA CONSTITUTION WHEN HE FAILED TO RAISE THE FOLLOWING ISSUES ON APPEAL:

(a).    PROSECUTORIAL MISCONDUCT IN SEEKING PROSECUTION ON AN AGGRAVATED BURGLARY CHARGE THAT SALTER WAS NEVER ACCUSED OF, ARRESTED FOR OR INDICTED ON;

(b).    PRESUMPTION OF VINDICTIVE PROSECUTION WHEN SALTER SUCCESSFULLY ATTACKED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL AND THE COURT ORDERED HIS IMMEDIATE RELEASE, BUT, BECAUSE OF VINDICTIVENESS, THE STATE FILED A NEW BILL OF INFORMATION OF AGGRAVATED BURLGARY, A CHARGE THAT HE WAS NEVER ACCUSED OF, OR ARRESTED FOR.

## ISSUES PRESENTED

I.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT.

II.    THE TRIAL COURT ERRED AND/OR ABUSED HIS DISCRETION IN SEVERAL EVIDENTIARY RULINGS THAT WERE PREJUDICIAL TO MR. SALTER IN VIOLATION OF 14TH AMENDMENT RIGHT TO THE UNITED STATES CONSTITUTION AND ARTICLES 2 AND 13 OF THE 1974 LOUISIANA CONSTITUTION.

III.    THE APPELLATE COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE 6TH AND 14TH AMENDMENT RIGHT TO THE UNITED STATES CONSTITUTION AND ARTICLES 2 AND 13 OF THE 1974 LOUISIANA CONSTITUTION WHEN HE FAILED TO RAISE THE FOLLOWING ISSUES ON APPEAL:

(a).    PROSECUTORIAL MISCONDUCT IN SEEKING PROSECUTION ON AN AGGRAVATED BURGLARY CHARGE THAT SALTER WAS NEVER ACCUSED OF, ARRESTED FOR OR INDICTED ON;

(b).    PRESUMPTION OF VINDICTIVE PROSECUTION WHEN SALTER SUCCESSFULLY ATTACKED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL AND THE COURT ORDERED HIS IMMEDIATE RELEASE, BUT, BECAUSE OF VINDICTIVENESS, THE STATE FILED A NEW BILL OF INFORMATION OF AGGRAVATED BURLGARY, A CHARGE THAT HE WAS NEVER ACCUSED OF, OR ARRESTED FOR.

(c).    PRESUMPTION OF VINDICTIVE PROSECUTION ARISED WHEN THE DISTRICT ATTORNEY'S OFFICE, THEREAFTER,   CHARGED SALTER AS A HABITUAL OFFENDER AND HE WAS GIVEN A LIFE SENTENCE BECAUSE OF HIS SUCCESSFUL SPEEDY TRIAL CHALLENGE.

### ISSUE NUMBER ONE

### THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT.

*Issues One and Two were filed on appeal*

As defined by Louisiana's statutory law, the essential elements of the crime of aggravated burglary are set out in the pertinent portion of the statute:

La. R.S. 14:60. Aggravated burglary

Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft herein, if the offender,

> (1) Is armed with a dangerous weapon; or
> (2) After entering arms himself with a dangerous weapon; or
> (3) Commits a battery upon any person while in such place, or in entering or leaving such place.

Now the intent to commit a felony therein that's going to be something that you will have to make the call on. It's certainly my contention that Aaron Salter intended to force Joyce Bennett into this vehicle and leave with her. And that's a kidnapping. Now he wasn't successful, but again, if you recall, you don't have to be successful for that particular element of the crime. It's want his intent was when he was making entry back into Ms. Lori Lee Turner's trailer. So that's what constitutes element number three.[1]

In fact, the testimony of the State's witness, Robert Crain was that he saw Mr. Slater giving Ms. Bennett a severe beating, saw that no one was helping her, so took it upon himself to beat Mr. Salter.

So I went over there and started beating him. And I beat him all the way to his car and kicked him between the legs when he bent over to unlock it.[2]

There was nothing that anyone saw or that happened to indicate that Mr. Salter entered the trailer with the intent to do anything other than batter Ms. Bennett. Very importantly, the aggravated burglary statute does not include the intent to commit a felony any place other than within the inhabited dwelling. That's why the aggravated burglary statute contains this language: "with the intent to commit a felony or any theft therein." Indeed, the State's theory of the case, as argued to the jury in the prosecutor's closing argument quoted above, was that "Aaron Salter intended to force Joyce Bennett into his vehicle and leave with her." Plainly, it was impossible for Mr. Salter "to force Joyce Bennett

---

1   R, p. 614.
2   R, p. 423.

into his vehicle and leave with her" inside the trailer of Ms. Turner. Furthermore, dragging Ms. Turner outside of the trailer cannot be construed as a kidnapping that took place inside the trailer.

In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 37, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La. 1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; see State v. Neal, 2000-0674 p. 9 (La. 6/29/01), 796 So.2d 649, 657, cert., denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of La. R.S. 15:438 "works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." Neal, 2000-0674 p. 9, 796 So.2d at 657.[3]

There was hearsay testimony to the effect that Mr. Salter had kidnapped Ms. Salter, forced her to have sex with him and to prostitute herself over the preceding three days. There was likewise evidence offered by the defense to contradict these allegations. However, under the facts of this case, the aggravated rape statute is restricted by its own terms to individuals who enter the inhabited dwelling with the intent to commit a theft or felony therein. Mr. Salter may have entered the trailer with the intent to commit a battery on Ms. Bennett "therein" but that is not a felony. The fact is that even viewing the evidence in the light most favorable to the prosecution, no reasonable finder of fact could have found beyond a reasonable doubt that Mr. Salter entered the trailer with the intent to commit a theft or felony therein. Similarly, the evidence was insufficient to convict Mr. Salter of the lesser included offence of simple burglary because that statute also includes as an element of the offence that the entering be done "with the intent to commit a felony or any theft therein."[4] Therefore, the evidence was insufficient to convict Mr. Salter of the crime of aggravated burglary or the lesser-included offence of simple burglary.

## ISSUE NUMBER TWO

---

3  State v. Draughn, 2005-1825 (La. 01/17/07); 950 So.2d 583, 592.

4  La. R.S. 14:62. Simple burglary

A.  Simple burglary is the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery, with the intent to commit a felony or any theft therein, other than as set forth in R.S. 14:60.

B.  Whoever commits the crime of simple burglary shall be fined not more than two thousand dollars, imprisoned with or without hard labor for not more than twelve years, or both.

THE TRIAL COURT ERRED AND/OR ABUSED HIS DISCRETION IN SEVERAL EVIDENTIARY RULINGS THAT WERE PREJUDICIAL TO MR. SALTER IN VIOLATION OF 14TH AMENDMENT RIGHT TO THE UNITED STATES CONSTITUTION AND ARTICLES 2 AND 13 OF THE 1974 LOUISIANA CONSTITUTION.

### A.

The State planned to introduce hearsay testimony allegations made by an absent witness, Joyce Bennett, that Mr. Salter had kidnapped and raped her in the three-day period before the alleged aggravated burglary. The purpose was to prejudice the jury against Mr. Salter and to suggest that the past was prologue to the future, that Mr. Salter entered the trailer of Lori Lee Turner with the intent to kidnap Ms. Bennett. The very first witness called by the State was Lori Lee Turner. On direct examination by the prosecutor she mentioned that Ms. Bennett "told me what he did to her."[5] The following took place immediately thereafter:

> Q:   What did she say?
> A:   He said - -
> MR. JOSEPH: Objection calls for hearsay, Judge.
> THE COURT; Res gestae. Overruled.
> EXAMINATION BY MR DEARING:
> Q:   What was her emotional state like?
> A:   She was very upset, crying and shaking.
> Q:   What did she tell you had happened?
> A:   She told me that he was beating her and putting, making her trick. That he had kidnapped her for three days. If she didn't bring drugs or money back he would beat her.
>
> Q:   Did she say anything about whether the defendant had sex with her?
> A:   Yes.
> Q:   Whether Mr. Salter had sex with her?
> A:   Yes.
> Q:   What did she say about that?
> A:   She said that he forcibly – that she didn't want to be with him, you know.[6]

The trial judge erred and/or abused his discretion in over-ruling an entirely proper hearsay objection with: "Res gestae. Overrule."[7] The ruling was a non-sequitor response to the hearsay objection. The res gestae[8] ruling was merely a finding that the subject matter of the witness's testimony was relevant and should have had nothing to do with the hearsay objection. The hearsay objection is

---

5   R. p. 383.
6   R. pp. 383-384.
7   R. p. 383
8   The res gestae exception to the admission of evidence of other crimes has been codified in the portion of L.C.E. Art. 404(B)(1) that makes the admission of evidence of other crimes, acts, or wrongs "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."

based upon L.C.E. Art. 802 that states: "Hearsay is not admissible except as otherwise provided by this Code or other legislation." The hearsay rule is concerned with the reliability of the hearsay while res gestae is concerned with the relevancy of the subject matter of the hearsay. Thus, the ruling of "res gestae" failed to address the hearsay objection.

Furthermore, no exception to the hearsay rule applied to Ms. Turner's testimony. In particular, the excited utterance exception in L.C.E. Art. 803(2) does not apply to the facts presented. Ms. Turner's testimony that Ms. Bennett "was very upset, crying and shaking" was on its face insufficient to qualify Ms. Bennett's hearsay as the result of an excited utterance. L.C.E. Art 803(2) states: "Excited utterance. —A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The hearsay testimony of Ms. Bennett was not made under the stress or excitement caused by the event or condition but was instead made in a conversation with Ms. Turner.

### B.

Jarred Lunsford, a property detective for the St. Tammany Parish Sheriff's Office, testified as a witness for the State. Over the defense hearsay objection the trial court permitted him to testify to what Ms. Turner had allegedly told him that Ms. Bennett had told her in response to his questioning of her after the incident for which Mr. Salter was on trial. This was double hearsay.

> Q:       And what did she relate to you had occurred prior to your arrival?
> MR. JOSEPH: Objection, hearsay.
> THE COURT: Overruled. 803 Subsection 2
> MR. JOSEPH [sic]: Thank yo, Judge
> THE WITNESS: She had told me she defended the white female. That the
> female had come to her door and told her that she had been raped and was being
> held against her will. . .[9] [emphasis added.]

L.C.E. Art. 803(2) states: "Excited utterance. —A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." the objectionable hearsay testimony of Ms. Turner related only to what another party [Ms Bennett] had told her about past events that Mr. Turner had not personally witnessed.

### C.

The trial court over-ruled a defense objection that officer Lunsford to testify that in hindsight he would have pursued the charge of aggravated burglary for which Mr. Salter was then on trial.

Q. Based on the facts as you know them here today and based on your

---

9  R. pp. 445-446.

experience, is there a particular offense that you would have pursued a warrant
for based on the events that occurred at that trailer park?
MR JOSEPH: Objection, Judge. Calls for a legal conclusion.
MR JOSEPH: Not legal conclusion
THE COURT: I am going to overrule the objection.
THE WITNESS: Yes, sir.  In hindsight or 20/20 I would have pursued
aggravated burglary.[16]

Thus, the State was able to have a police officer give his opinion ot the jury, under oath, that
under the facts of this case the charge of aggravated burglary was a proper charge. The intended effect
was to unfairly prejudice the jury that an experienced police officer believed that the facts of this case
clearly supported the charge for which Mr. Salter was on trial.

All of the evidentiary errors made by the trial court were the result of the prosecutor's calculated
plan to unfairly prejudice the jury against Mr. Salter.

## ISSUE NUMBER THREE

THE APPELLATE COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE
6TH AND 14TH AMENDMENT RIGHT TO THE UNITED STATES
CONSTITUTION AND ARTICLES 2 AND 13 OF THE 1974 LOUISIANA
CONSTITUTION WHEN HE FAILED TO RAISE THE FOLLOWING ISSUES
ON APPEAL:

(a) PROSECUTORIAL MISCONDUCT IN SEEKING PROSECUTION ON AN
    AGGRAVATED BURGLARY CHARGE THAT SALTER WAS NEVER ACCUSED OF,
    ARRESTED FOR OR INDICTED ON;

(b) PRESUMPTION OF VINDICTIVE PROSECUTION WHEN SALTER
    SUCCESSFULLY ATTACKED HIS CONSTITUTIONAL RIGHT TO A
    SPEEDY TRIAL AND THE COURT ORDERED HIS IMMEDIATE
    RELEASE, BUT, BECAUSE OF VINDICTIVENESS, THE STATE FILED
    A NEW BILL OF INFORMATION FOR AGGRAVATED BURLGARY, A
    CHARGE THAT HE WAS NEVER ACCUSED OF, OR ARRESTED FOR.

(c) PRESUMPTION OF VINDICTIVE PROSECUTION ARISED WHEN THE
    DISTRICT ATTORNEY'S OFFICE, THEREAFTER, CHARGED SALTER
    AS A HABITUAL OFFENDER AND HE WAS GIVEN A LIFE
    SENTENCE BECAUSE OF HIS SUCCESSFUL SPEEDY TRIAL
    CHALLENGE.

---

16 R. p. 447.

## LEGAL STANDARD

In assignment of error number 1, the defendant argues that the evidence was insufficient to support the verdict. He concedes that the evidence sufficiently established he entered Turner's trailer without permission and committed a simple battery therein or in entering or leaving the trailer. He notes however, simple battery is not a felony, and he was not armed and did not commit a theft.  While the State's theory of the case was that the defendant entered the trailer with the intent to kidnap J.B., and leave in his car, the defendant argues the completed kidnapping offense had to occur inside the trailer, but "it was impossible for [the defendant] 'to force [J.B.] into his vehicle and leave with her' inside the trailer of Turner.

At trial, Salter relied upon his presumption of innocence and did not take the stand.  No where in the trial record does it reflects Salter conceding to entering the trial without permission, or that he committed a battery on anyone.   Appellate counsel's misrepresentation of the facts produced a judgment contrary to the evidence.

As to appellate counsel's second claim on appeal, i.e., the trial court erred and/or abused his discretion in several evidentiary rulings that were prejudicial to Salter.  Appellate counsel challenged the trial court allowing the hearsay testimony of Turner to be heard by the trial jury.  Lee testified to the allege rape and kidnapping of Bennett.  Bennett never testified at trial, but her version of how she was raped, beaten and kidnapped for three (3) days by Salter, was heard by the jury from the testimony of Turner and Detective Jarred Lunsford.  Trial counsel filed pretrial motions objecting to the unfairness of this testimony going to the jury without the presence of Bennett.

On appeal appellate counsel briefly raised this issue, in denying relief the court held:

that "[t]he evidence concerning J.B.'s allegations was not offered to prove the truth of the mater asserted, but was offered to show why Turner wanted to keep the defendant out of her trailer. Moreover, the trial court correctly concluded J.B.'s allegations related to conduct that constituted an integral part of the aggravated burglary. The evidence concerning J.B.'s allegations against the defendant was related and intertwined with the aggravated burglary to such an extent that the State could not have accurately presented its case without reference to the evidence.

In conclusion, the court went on to hold that the mere evidence Salter held J.B., against her will was highly probative of his motive, intent, and plan. And Det. Lunsford's testimony was cumulative of the account of Turner's and therefore harmless.  According to the State court, as it relates to Det. Lunsford, "[t]he prejudicial effect to the defendant from the challenged evidence did not rise to the level of undue or unfair prejudice when balanced against the probative value of the evidence, whereby denying relief.

Absent from the appellate counsel's logistic argument on appeal was the challenge to the

reliability of both Turner and Lunsford's hearsay testimonies being that there were evidence in defense counsel's file that the State knew Bennett was a convicted felon, a drug addict and a habitual liar where she even went as for as lying to the State prosecutor. Giving them a fictitious address so that she would never be located. An indication that the State intentionally concealed the reliability of its own witness to prevent Salter from receiving a fair trial. Because there is a grave possibility that a rape or kidnap never occurred; thus, calling into question the charge of aggravated burglary that, likewise, never happened.

The right to effective assistance of counsel on appeal comes the responsibility of counsel to ensure his client has a meaningful appeal – free from the failure to disclose nonfrivolous issues and to file a merits brief raising them, such as, prosecutorial misconduct and vindictive prosecution. Especially, when the trial record reflects such, and the defendant's trial counsel failed to object or preserved the record for appellate review.

Under the Sixth and Fourteenth Amendment to the United States Constitution, appellate counsel inherits the responsibility to raise said errors on direct appeal. As quoted from the United States Supreme Court decision in **U.S. v. Williams**, 112 S.Ct. 1735, 504 U.S. 36 (1992), "[l]ike the Hydra slain by Hercules, prosecutorial misconduct has many heads." Justice Sutherland, in **Berger v. United States** describes the prosecution responsibility as followed:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor —indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. 295 U.S., at 88, 55 S.Ct. At 633.

Therefore, as determined by the United States Supreme Court, it is equally clear that the prosecutor has the same duty to refrain from improper methods calculated to produce a wrongful conviction. In doing so, the prosecutor has a duty to protect the fundamental fairness of judicial proceedings for which assumes special importance when he is presenting evidence to a trial jury.

### (a).   PROSECUTORIAL MISCONDUCT IN SEEKING PROSECUTION ON AN AGGRAVATED BURGLARY CHARGE THAT SALTER WAS NEVER ACCUSED OF, ARRESTED FOR OR INDICTED ON;

## LEGAL ARGUMENT:

As for the case at bar, appellate counsel did challenged the insufficiency of evidence and the introduction of hearsay evidence by the State that prevented Salter from receiving a fair trial, but the essence of the State's case against his client was the clear operation of prosecutorial misconduct for which he failed to challenge. The subterfuge of the State's conduct did not start when Salter was tried for the trumped-up charge of aggravated burglary, it started when a mysterious white female claimed she was beaten, raped and kidnapped by a black man. She told her story first to Lori Lee Turner, an old black woman, who was presently on probation, a former drug addict and was once raped herself. At trial, Lee reiterated this story and painted a graphic picture to the jury on the bruises she observed on Bennett after entering the trailer.

> Q.    Now if you could – the part that I interrupted you, you said that sometime after the events we just talked about, the female came back to your door and knocked on it?
> A.    She said she wanted to use the rest room.
> Q.    What did you do?
> A.    I told her she could. And then I saw the bruises on her.
> Q.    Okay.
> A.    And she said I can't go back out there. I am scared. I have four daughters, I mean, three daughters. I just knew something was wrong with them bruises. And she told me what he did to her. (T.tr.p. 383).
>
> Q.    What did she tell you had happened?
> A.    She told me that he was beating her and (T.tr.p. 383) putting, making her trick. That he kidnapped her for three days. If she didn't bring drugs or money back, he would beat her. (T.tr.p. 384).
>
> Q.    Okay. And what happened to the female after?
> A.    They took her – the ambulance came and took her to the hospital. Because she was bruised up and stuff, you know. (T.tr.p. 386).

Under cross-examination by defense counsel, Lee testified to where she observed the bruises on

Joyce Bennett:

> Q.    Let's talk about this beating. You said you looked at her and you could tell she was afraid. And you looked at the bruises on her body?
> A.    Exactly.
> Q.    Tell us about those bruises?
> A.    She had bruises on her arm and one on her neck. And she had bruises on her back. I seen the bruises on her arm and then she showed me the bruises on her back.
> Q.    Okay.
> A.    And she told me that he had been beating her.
> Q.    Let me make sure I have this correct. Was it the right arm or the left arm

with bruises?

A.     Sir, I don't remember.

Q.     You don't remember?

A.     I just know she had bruises on her arm. If I am not mistaken, it was the left arm.

Q.     Okay. So it was only bruises on the left arm and not the opposite arm?

A.     She just showed me her left arm. I mean, I could see her left arm bruised up, because she had on a shirt, a short-sleeve shirt. I didn't see no bruises on both arms. I just seen bruises.

Q.     So it was -- (T.tr.p. 394).

A.     And I freaked.

Q.     So the shirt that she was wearing, the bruise was apparent to you?

A.     Yes.

Q.     She is a white female. What color was the bruise? Was it black, was it purple, was it blue, or do you recall?

A.     Bruise is purple. Blue and purple. When they black, it's really bad.

Q.     Now you said there was also a bruise on her back.

A.     Yes.

Q.     Correct. And could you show the ladies and gentlemen of the jury exactly where on the back do you recall seeing that bruise?

A.     It was – I think it was right up around her, right on her neck part. Right up in the shoulder area here. (Indicating.) Like he was pulling her by her neck or punching her. I don't know. She say he was slapping her and punching her. I am just going by what she told me. (T.tr.p. 395).

The State then called Robert Crain to the stand and he testified as followed in relation to how he observed Salter beating Joyce Bennett.

Q.     What did you do as a result of hearing that screaming and hollering?

A.     I walked around here so I could see between the people. There was 10 or 12 of them out there hollering. And I seen a 6 foot something black guy just about to kill a white girl, a woman. I don't know. I ain't never seen either one of them before or after. And nobody was helping her. And I was afraid for her life. So I went over there and started beating him. And I beat him all the way to his car and kicked him between the legs when he bent over to unlock it. (T.tr.p. 423).

Q.     In relation to each other? How close are they to each other when you see them?

A.     Oh, they was – he had her like this and the trailer was right there. He was just (Indicating) banging her head and smacking her with his fist.

Q.     He was hitting on her?

A.     Oh, yeah, he was beating her – yeah, about to kill her.

Q.     Tell us what did you do in response to seeing that?

A.     Sir?

Q.     What did you do in response to seeing the tall, black male hitting the small, white female?

A.     Well, I was afraid for her life and nobody else was helping so I had to do something. (T.tr.p. 424).

Q.     The female that you saw that he was hitting on, had you ever seen her before?

A.    No, sir. (T.tr.p. 425).

Under cross-examination by defense counsel, Crain as well painted a disturbing picture on how

he observed Joyce Bennett being gruesomely beaten by Salter:

Q.    You were looking between them.  Where was she in relation to Lori Lee's
FEMA trailer?
A.    Her trailer is here, and there is another trailer right there, and that's where
he was beating her at right there. (Indicating.)  Right straight across from me at a
diangle (sic).
Q.    Was she up against the trailer?
A.    The woman getting beat?
Q.    Yes. (T.tr.p. 428).
A.    Yes, she was getting her head slammed against the trailer, and getting a
fist upside the head and everything else.
Q.    So you actually saw this man take the white female and ram her head into
the trailer?
A.    He was hitting her.  And then he was slamming her head in the trailer.
Yes, sir, I did.
Q.    Wow.  Where was he hitting her?  Where was he punching her?
A.    He punched her in the face.  Anywhere he could hit her.
Q.    Any place else on her body?
A.    He was punching her.  And all I know is she was screaming for dear life.
And there wasn't nobody doing nothing.
Q.    But you distinctly remember him punching her in the face?
A.    Yeah, he punched her anywhere he could hit her.  He probably missed her
a few times, too.
Q.    Was it with great force or was it just a tap?
A.    It wasn't no tap.
Q.    It wasn't a tap.  Great force?
A.    No, if it was a tap, I wouldn't have had to do what I had to do.  (T.tr.p.
428).
Q.    Now as you were observing Mr. Salter forcefully beating this woman, did
you notice any blood, or any bruises, or injuries to her?
A.    I am sure I did.
Q.    Would you describe that for the ladies and (T.tr.p. 429) gentlemen of the
jury?
A.    All I can tell you is she was bleeding, and he was beating the crap out of
her.  And somebody had to do something.
Q.    Now did she have blood on her clothing?
A.    I can't say where she had the blood at, because it was all happening.  And
he was beating her and she was screaming.  And so I just went and did what I
had to do.  I didn't pay attention where the blood was laying on the lady.  All I
know is when I got through, she was still breathing, and he was going to this car.
And I did what I was supposed to do.  If not, somebody would have died.
Q.    What makes you think that, sir?
A.    Because he was about to kill her that's why I think that.  Or I wouldn't
have had to jump on the man.

Q.      Crain, what makes you think, from what you saw, that her life was in jeopardy?

A.      Well, if you would have been there, you wouldn't have to ask that question. Because like I done told you over and over again, you don't seem to understand that he was beating the crap out of the girl, and she was just on the verge of passing out. And I don't think he would have stopped then if somebody wouldn't have intervened.

Q.      So did she ever hit the ground at any time?

A.      I don't think so, because he was holding her up while he was hitting her. I told you he was slamming her up against the trailer. You can't hit with one hand without holding her up with the other. (T.tr.p. 430).

Contrary to both Turner and Crain dramatic testimonies, when Bennett arrived at the North Shore Regional Medical Center emergency room, she displayed no signs of physical torture as dramatized by the State's witnesses. Doctor Andrew Marsh testified that he examined Bennett and found no signs that she had been raped, or physically beaten. He found no bruises or trauma to her face, head, arm or back. Nor did he see any signs of strangulation. (T.tr.pp. 542-43). In support of his testimony, he introduced the Nurse's note which indicated there was no visible signs of trauma to the head, cerebral, chest, back or extremities. (T.tr.p. 546). In further contradiction to Crain's testimony, Bennett's cloth was clean and intact. (T.tr.p. 547). The only visible wound he observed was a minor abrasion on Bennett's neck. To make matters worse, Bennett's condition did not warrant a CAT scan. (T.tr.p. 543).

However, even with this lack of evidence against Salter, a warrant was still issued for his arrest for the aggravated rape and kidnapping of Bennett. Judging from the graphic testimonies of the State witnesses, one can imagine how Salter was aggressively pursued, arrested and later indicted. Strangely, however, Bennett just disappeared -- out of thin air. She was never, ever seen or heard from again. All that remains was her ghostly-tale for which St. Tammany Parish District Attorney's office aggressively relied upon to persecute Salter.

The only evidence that the State had to say Salter committed a crime was the ghostly-tale of Bennett, a white woman. But when Bennett up and disappeared, the State somehow entrapped Turner, an old black woman, currently on probation, and a former drug user, to reiterate what Bennett told her under the guise of excited utterance. Notice should be taken that this was approximately two years later after the initial crime, that the State reached back to Lee and inquired about her trailer, Salter was charged by the St. Tammany Parish District Attorney's office under a bill of information with aggravated burglary to Lee's trailer. At the trial on aggravated burglary, Lee was allowed to testified fully to Bennett's allege rape and kidnapping even though she did not witness it, or knew whether or not it was true. 97% of the State's witnesses testimonies were about the rape, brutal beating and

kidnapping of Bennett, not the alleged aggravated burglary to Lee's trailer. This dramatization of Bennett, a white female, being victimized by Aaron Salter, a black man to an all white jury over shadowed Dr. Marsh's testimony that there was no signs of any rape or beating.

The State knew that Bennett abscond from justice, not because she was so traumatized she could not stand seeing Salter at trial; or that she did not want to relive this ordeal again. Bennett's arrest record reflects that, in October 2007 she was picked up on a bunch of traffic charges in Slidell, to which she pled guilty. She had a warrant out for her arrest in Bay St. Louis, Mississippi, under police item number C23010700405 for distribution of a controlled dangerous substance. (**See former defense counsel Dwight Doskey's June 9, 2009 attached letter**).

But most disturbing is that she literately gave St. Tammany Parish District Attorney's office a false address. She gave the prosecutor 507 Avenue E in Marrero, Louisiana as the address she lived at. Salter's former defense counsel, Dwight Doskey, went to the location of this address and found that it was no such 507 on Avenue E. He interviewed two people in that neighborhood and they have never heard of a 507 Avenue E, nor did they knew the name Joyce Bennett. (**See former defense counsel Dwight Doskey's December 3, 2009 attached letter**).

Therefore, it appears the State knew all the while Bennett was a liar. If Bennett intentionally deceived the State, why would she not falsely accuse Salter of the crime as well. Why would she not lie to Lee or to he detectives involved in her suppose rape and kidnapping. So it is not strange that Bennett failed to report to any of the Salter's court proceedings knowing now that she is a liar.

What the Court cannot ignore is that Bennett did not want to repeat what we now know to be lies. So for the State to improperly activate the **exciting utterance** exception on questionable allegations that they had a strong hunch were lies, just to strengthen a weaker crime that actually never existed, is a serious case of prosecutorial misconduct at its fullest. The State's improper usage of hearsay exception of *excited utterance* through the testimony of Turner was prosecutorial misconduct and denied Salter a fair trial because the State knew Bennett was an unreliable witness.[11]

The State knew, or had the resource to find out that Bennett had a long criminal history, especially with drug abuse. In November of 1995, she was arrested and thereafter plead guilty to unauthorized use of credit card $100+. In February 1996, she was arrested for (1) illegal possession of stolen things, (2) unauthorized use of a credit card and (3) access device fraud charge, and plead guilty and received three years probation. In January 2000, Joyce M. Bennett was arrested for (1) possession of schedule I drugs, (2) distribution of schedule I Narcotics, (3) possession of schedule II narcotics and

---

11  In hindsight, the testimony of Turner was offered as an assertion to show truth of matters asserted in Bennett's statement and rested for its value upon credibility of Bennett, and thus such testimony was actually hearsay evidence. State v. Henderson, 362 So.2d 1358 (La. 1978).

distribution of schedule II narcotics, plead guilty as charged. **(See attached arrest record).**

No matter how weak the evidence was against Salter, the St. Tammany Parish District Attorney's office, has made him a marked man simply because he was accused of committing the ultimate crime, *brutally raping a white woman*. For this reason and for this reason alone, Walter Reeds' District Attorney's office decided to prosecute him to the fullest. Even with the lack of physical evidence Bennett was raped, her allegations alone was enough for Reed' office to pursue the ultimate penalty, if not death, life imprisonment.

Unfortunately for the State, however, Bennett was not willing to continue the charade she started, but Reed's office was. And his office did so in such an illegal manner, that for the first time in American history, the statute of Liberty herself can be seen sharing tears of shame because racial injustice is live and well in the United States of America. It has become well hidden in the United States America Judicial Systems, camouflaged in laws that have the appearance of fairness, but in all actuality, fundamental fairness is its least concern.

Nevertheless, the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. **Smith v. Phillip**, 102 S.Ct. 940, 455 U.S. 209 (1982). The introduction of Bennett's alleged rape and kidnapping to the extent where the State actually presented witnesses and evidence, such as, police officers investigating the rape and alleged crime scenes, a search upon Salter's car disclosing Bennett's personal paraphernalia, went far and beyond the scope of *excited utterance*.

Louisiana recognizes excited utterance as (1), a statement resulting in reflective thought, that is, statement was self-serving or made in response to inquiry; statement was beyond description of exciting event into past events or future; and proof that declarant performed tasks requiring reflective thought processes between time of event and statement. **State v. Henderson**, 362 So.2d 1358 (La. 1978).

As applied to Salter's case, there was never an event sufficiently startling to render normal reflective thought processes of an observer inoperative. For instance, at trial, Lee testified ". . . she [Joyce Bennett] asked to use the rest room. I sit there and let her use the rest room. And when she came out, she started telling me -- she didn't ask me to smoke no dope in my house. She only asked – I am scared, and he beat me up, and the whole nine yards." (T.tr.p. 394).

It was not until Salter allegedly came knocking on the trailer door looking for Bennett when Lee said she tried to protect Bennett. At this time, Bennett had already told her this tale. Bennett was never in the state for the State to use excited utterance as an excuse to enhance the reliability of Lee's testimony. Moreover, even though Salter was being tried for aggravated burglary on Lee's trailer, it is

Salter's contention that the State went far and beyond the hearsay doctrine solely to contaminate Salter's character with rape and kidnapping allegations.

In closing argument, the State went as far as telling the jury "would have loved to produce Bennett for you. She is not here, and that is why the rape charge and the kidnapping charge are not being presented to you." (Doc. p. 647). From this statement, one can conclude that the State introduction of Bennett's allege rape and kidnapping was calculated to mislead, or confuse the jury. If this was not the case, why would the prosecutor make such a statement if he was not confident in the evidence produced thus for.

For all the above reasons, there is a reasonable likelihood that the full disclosure of the crimes of rape and kidnapping to the jury affected the judgment. It was Salter's appellate counsel, not the prosecutor, who primarily is charged with protecting Salter's rights. As such, appellate counsel's performance for failing to raise said issue on appeal was both deficient and prejudicial because the prosecutor misconduct denied Salter a fair trial.

### (b). PRESUMPTION OF VINDICTIVE PROSECUTION WHEN SALTER SUCCESSFULLY ATTACKED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL AND THE TRIAL COURT ORDERED HIS IMMEDIATE RELEASE, BUT, BECAUSE OF VINDICTIVENESS, THE STATE FILED A NEW BILL OF INFORMATION FOR AGGRAVATED BURLGARY, A CHARGE THAT HE WAS NEVER ACCUSED OF, OR ARRESTED FOR.

#### *LEGAL ARGUMENT*

Quite distinctive from the chronological events given for the State's prosecutorial misconduct is the vindictive prosecution against a defendant for having successfully attacked his constitutional right to a fast and speedy trial. **North Carolina v. Pearce**, 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656. That is, the Due Process Clause of the Fourteenth Amendment "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." This same principle was later applied to prohibit a prosecutor from reindicting a convicted misdemeanant on a felony charge after the defendant had invoked an appellate remedy, since in this situation there was also a "realistic likelihood of vindictiveness." **Blackledge v. Perry**, 417 U.S., at 27, 94 S.Ct., at 2101.

The Court has emphasized that the due process violation in *Pearce* and *Perry* lay in the danger that the State might be retaliating against the accused for lawfully attacking his conviction. **Blackledge v. Perry**, supra, 417 U.S., at 26-28, 94 S.Ct., at 2101-02. It may help to emphasize that in *Pearce*, the

Court held, to punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. North Carolina v. Pearce, supra, 395 U.S., at 738, 99 S.Ct., at 2082).

As with the present case, the prosecutor's initial assessment of Aaron Salter's case led the State to forgo an indictment on aggravated burglary when it was supposed to had been the same commission of offense. On February 26, 2008, the grand jury returned a true bill indicting Salter with one count of aggravated rape *only*. On August 19, 2009, Salter filed a motion for speed trial in accordance with La.C.Cr.P. Art. 701. By January 19, 2010, the State of Louisiana had not advanced Salter's matter to trial. On January 19, 2010, the court granted Salter's motion for a speedy trial and ordered his release on his own recognizance. On this same day of January 19, 2010, the St. Tammany Parish District Attorney's Office circumvented Salter's right to an immediate release from custody by filing a bill of information against him for aggravated burglary, which was based upon the very same nucleus of facts that the grand jury indicted him on for aggravated rape.

A person, such as Salter, was entitled to pursue his statutory right in filing a motion for a speedy trial without apprehension that, if he succeeds, the State will retaliate by instituting a new charge, thus subjecting him to another prosecution. Therefore, the imposition of a penalty upon Salter for having successfully pursued his statutory right to a speedy trial is a violation of due process of law.

Mr. Salter contends that he is actually innocent of the crime that he stands convicted of committing, because the State failed to meet its burden of proof as required by R. S. 15:439 of the La. C. Cr. P.

> "The burden of proof is upon him
> alleging the existence of a fact."
> R. S. 15:439, La. C. Cr. P.

On April 21, 2011, the State initiated prosecution against Mr. Salter in the matter of State of Louisiana v. Arron Salter, No. 482750, Twenty-Second Judicial District Court, Parish of St. Tammany, State of Louisiana, for violation of R. S. 14: 60 of the Louisiana Code of Criminal Procedure, on a Bill of Information which alleges that Mr. Salter committed aggravated burglary in St. Tammany Parish on August 26, 2007.

At trial on July 13-15, 2011 the State's prosecutor contended that Mr. Salter entered the trailer at 41931 Hwy 190 with the sole purpose of removing Ms. Bennett from the premises. The State's contention that Mr Salter entered the trailer with the intent to kidnap Ms. Bennett fails to meet the requirements needed for charging Mr. Salter with violation of R. S. 14:60 of La. C. Cr. P., which provides that;

" Aggravated Burglary is the unauthorized entering of any
inhabited dwelling, or of any structure, water craft,
or movable where a person is present, with the intent to
commit a felony or any theft therein, if the offender,"

1.   Is armed with a dangerous weapon; or

2.   After entering arms himself with a dangerous weapon; or

3.   Commits a battery upon any person while in such place, or in entering or leaving such place.

### R. S. 14:60, La. C. Cr. P.

By its own admission, the State submitted that the actions of Mr. Salter were of the specific intent to remove Ms. Bennette from the premises, **NOT** to commit a battery, **DID NOT** arm himself with a dangerous weapon; **or** armed with a dangerous weapon as required by R. S. 14:60 of the La. C. Cr. P.. A review of the record of fact in this matter will reveal that;

    A.   The State failed to present any Complaint, Incident, or Police Report
        pertaining to a burglary of any type at 41931 Hwy. 190 on Aug. 26, 2007,

    B.   The State Failed to present any witnesses who professed to have
        knowledge of a burglary at 41931 Hwy., on Aug. 26, 2007, and

    C.   The State failed to present any proof that Mr. Salter was armed
        with a weapon of any type on Aug. 26, 2007, or committed a Battery
        upon anyone

These failures by the State in its contention that Mr. Salter committed an Aggavated Burglary, serve as evidence of Mr. Salter's Actual Innocence of the offense that he stands convicted of.

Pursuant to the provisions of R. S. 15:439 of the La. C. Cr. P. , the State was required to prove its contention that Mr. Salter committed an Agg. Burglary at 41931 Hwy. 190 on Aug. 26, 2007, as alleged in the Bill of Information. For these reasons, Mr. Salter contends that a review of the record of fact in this matter will establish that he is actually innocent of committing a Aggravated Burglary on August 26, 2007 at 41931 Hwy. 190 in violation of R. S. 15:439 of the Louisiana Code of Criminal Procedure as alleged by the State in its Bill of Information, therein supporting Mr. Salters position of actual innocence.( See: **McQuiggias v. Perkins,** 133 S. Ct. 1924 ).

Again, it was Salter's appellate counsel, not the prosecutor, who primarily is charged with protecting Salter's rights. As such, appellate counsel's performance for failing to raise said issue on appeal was both deficient and prejudicial because the prosecutor misconduct denied Salter a fair trial.

    **(c).   PRESUMPTION OF VINDICTIVE PROSECUTION ARISED
WHEN THE DISTRICT ATTORNEY'S OFFICE, THEREAFTER,
CHARGED SALTER AS A HABITUAL OFFENDER AND HE WAS
GIVEN A LIFE SENTENCE BECAUSE OF HIS SUCCESSFUL SPEEDY**

TRIAL CHALLENGE.

## LEGAL ARGUMENT

This issue is incorporated with (b). Louisiana's jurisprudence on vindictive prosecution also applies to habitual offender bill of information. Relief can be obtain if the habitual offender bill can be explained only by a desire to punish or deter the exercise of legal rights. The right here is the same as in issue (b), that is, Salter's statutory right in filing a motion for a speedy trial for which he prevailed. However, the presume deterrent consequence which led to Salter's death sentence, i.e., life sentence without parole, probation or suspension of sentence, evolved with the exercise of his constitutional right.

It is also worthy to mention that Walter Reeds' District Attorney office was well within his discretion to filed a habitual offender bill of information against Salter. (See LSA-R.S. 15:529.1(d), La.C.Cr.P. Art. 61). The deference that courts properly accord the exercise of a prosecutor's discretion perhaps would foreclose judicial criticism if the prosecutor originally had sought an indictment against Salter at the time of the alleged rape. But, this was not the case here. And to make matters worse, the record before this court bears no explanation for the prosecutor's decision to lately bring a charge of aggravated burglary against Salter after he was successfully granted relief and ordered release. It cannot be say that the State's conduct is equally attributable to legitimate reason.

Couple with claim (b), Salter has met his burden of proving appellate counsel ineffectiveness for failing to raise a meritorious claim of vindictive prosecution on appeal.

**WHEREFORE**, Salter moves this Honorable Court to reverse his conviction and sentence, or in the alternative, conduct an evidentiary hearing.

Respectfully submitted,

Aaron Salter #101124

## CERTIFICATE OF SERVICE

I, Aaron Salter, hereby certify that a true and correct copy of the foregoing has this day been served upon the district attorney in and for the Parish of St. Tammany, State of Louisiana, by placing a copy of the same in the U.S. Main, postage prepaid, on this 12th day of January 2015.

Aaron Salter #101124
Camp D, Eagle Unit – 1
Louisiana State Penitentiary
Angola, LA 70712

District Attorney
701 N. Columbia Street
Covington, LA 70433

# STATE OF LOUISIANA
# COURT OF APPEAL, FIRST CIRCUIT

STATE OF LOUISIANA

VERSUS

AARON SALTER

NO. 2013 KW 1798

FEB 27 2014

In Re: Aaron Salter, applying for supervisory writs, 22nd Judicial District Court, Parish of St. Tammany, No. 482750.

BEFORE: KUHN, HIGGINBOTHAM AND THÉRIOT, JJ.

WRIT DENIED.

MRT
JEK
THE

COURT OF APPEAL, FIRST CIRCUIT

DEPUTY CLERK OF COURT
FOR THE COURT

# The Supreme Court of the State of Louisiana

STATE EX REL. AARON SALTER

VS.

STATE OF LOUISIANA

NO.  2014-KH-0639

– – – – –

IN RE:  Salter, Aaron; – Plaintiff; Applying For Supervisory and/or
Remedial Writs, Parish of St. Tammany,  22nd Judicial District Court
Div. E, No. 482750; to the Court of Appeal, First Circuit, No. 2013
KW 1798;

– – – – –

December 8, 2014

Denied.

MRC

JFV

JTK

JLW

GGG

Supreme Court of Louisiana
December 8,2014

Deputy    Clerk of Court
          For the Court

## PETITION UNDER 28 USC § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

(If petitioner is attacking a judgment which imposed a sentence to be served in the future, petitioner must fill in the name of the state where the judgment was entered. If petitioner has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion under 28 U.S.C. § 2255, in the federal court which entered the judgment.)

### PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

*Instructions–Read Carefully*

(1)   This petition must be legibly handwritten or typewritten, and signed by the petitioner under penalty of perjury. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form.

(2)   Additional pages are not permitted except with respect to the facts which you rely upon to support your grounds for relief. No citation of authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

(3)   Upon receipt of a fee of $5 your petition will be filed if it is in proper order.

(4)   If you do not have the necessary funds for transcripts, counsel, appeal, and other costs connected with a motion of this type, you may request permission to proceed *in forma pauperis*, in which event you must execute form DC 12, setting forth information establishing your inability to pay the costs. If you wish to proceed *in forma pauperis*, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution. If your personal account exceeds $_____, you must pay the filing fee as required by the rule of the district court.

(5)   Only judgments entered by one court may be challenged in a single petition. If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions as to each court.

(6)   Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the petition you file seeking relief from any judgment of conviction.

(7)   When the petition is fully completed, the original and at least two copies must be mailed to the Clerk of the United States District Court whose address is

(8)   Petitions which do not conform to these instructions will be returned with a notation as to the deficiency.

RECEIVED

APR 2 1 2015

Legal Programs Department

APRIL _20_ , 2015

Clerk of Court,
U.S. District Court,
Eastern District of Louisiana
500 Poydras Street, Room C-151
New Orleans, LA 70130

SCANNED at LSP and Emailed
4/21/15 by _CM_ . _40_ pages
date      initials   No.

RE: Aaron D. Salter v. N. Burl Cain, Warden, No. _____.

Dear Clerk:

    Please find enclosed an Original of my pro se *Petition for Federal Habeas Corpus* (*28 U.S. C. §

2254*) and accompanying *Memorandum of Law in Support* in the above referenced matter.  I

respectfully ask that you please file same into the docket of this court for judicial consideration and

disposition.

    Your cooperation and time in this matter are greatly appreciated.

                                        Respectfully,

                                        Aaron D. Salter #101124

Enclosure:

cc:    w/encl. District Attorney, St. Tammany Parish

TENDERED FOR FILING

APR 2 : 2015

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk